**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CRIMINAL NO.  1:05CR249-1**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **VS.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| | ) | |
| **COREY WILLIAM JONES** | ) | |
| _____ | ) | |

**THIS MATTER** came before the Court on January 9, 2006, for a

hearing on the Defendant's motion to suppress.  After the hearing, the

motion was denied.  The reasons for the denial are set forth below.

## I.  EVIDENCE PRESENTED

Vanessa Hensley, who is a social worker for the Avery County

Department of Social Services (DSS), testified that on February 24, 2005,

she received an anonymous report from someone who claimed to have

been in Cory Jones' home while he was manufacturing methamphetamine.

The reporter also stated that children were in the home at that time.

Hensley reported this to her supervisor who then called the Avery County

Sheriff's Department.  Hensley testified that when a report is made involving children in a setting where methamphetamine may be located, it is the policy of DSS to respond immediately and to send more than one social worker to the scene.  As a result, Hensley's supervisor, Mark Chapman, accompanied her to Cory Jones' home.  DSS also requested that deputy sheriffs accompany them to the residence.

On February 24, 2005, Hensley and Chapman went with Deputy Sheriffs Marc Jardon and Cory Hughes to the Defendant's residence. Hensley testified that they went to the front door and Chapman asked if they could go inside the house.  The Defendant responded that they could. Chapman went into the kitchen while Hensley and Jardon went upstairs. Defendant told Jardon that no one else was in the house.  Hensley saw rubber tubing, glass jars, and a glass flask in a closet (which had no door) near the bathroom; she reported what she had seen to Jardon.  He told her to go downstairs and they immediately exited the house.  Hensley testified that she has had training to recognize methamphetamine laboratories. She also testified that she was not inside the house long enough to notice if there were any signs of children but they did not find any children in the house.

Deputy Sheriff Jardon testified his department received a request to escort the DSS workers to Jones' residence.  He also testified that it is against departmental policy for sheriffs to escort DSS workers when they go to homes suspected of having a methamphetamine laboratory because of the potential danger.  As a result, he called the State Bureau of Investigation (SBI) to whom he explained the situation and they requested that the deputies accompany the social workers.  The SBI also instructed him to immediately leave the premises if evidence of such a lab were found.  Jardon testified that Chapman knocked on the door and when the Defendant answered it, Chapman told him that DSS had a complaint about children to investigate and that he had two deputies with him.  The Defendant told them they could enter the house.  Jardon asked the Defendant if he could go upstairs and the Defendant answered affirmatively.  At the top of the stairs, he saw firearms.  When Hensley reported the items in the closet to him, he told everyone to leave the house because the fumes from such an operation are dangerous.

Prior to this time, Jardon had been investigating the Defendant and had received information from an informant.  He did not know if that

informant was the same person who made the report to DSS. Prior to the call from DSS, he was not aware that any such report had been made.

The Defendant testified that he has a seven year old son who lives with his mother but who visits him every weekend. He had not been at the house in the days preceding this event. The Defendant testified that he heard a knock at the door and saw two officers and two other people outside. Chapman told the Defendant that he "needed" to come into the house. The Defendant testified that he did not believe he had a choice, *i.e.*, because DSS wanted to enter his home, he believed he had to allow them to do so. When asked how he came to know this, the Defendant testified that his attorney told him that DSS had the right to enter. When asked if he knew this at the time Chapman was at his home, the Defendant stated that he had always had general knowledge that DSS could enter a home. He also testified that he had known Deputy Hughes most of his life.

## II.  STANDARD OF REVIEW

"According to the Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 [ ] (1973), consent is an issue of fact, and a determination of whether a

particular consent is truly voluntary is made by examining the totality of the circumstances surrounding the consent." ***United States v. Rusher*, 966 F.2d 868, 877 (4ᵗʰ Cir. 1992).** "Although such consent must be voluntary, it is not necessary that [the Defendant] knew he had the right to refuse consent." ***United States v. Jackson*, 151 F.3d 1031 (table), 1998 WL 386119, \*\*2 (4ᵗʰ Cir. 1998) (citing *Bustamonte*, *supra*).** Among facts considered are the Defendant's age, intelligence, and education; the extent to which he cooperated with the police; and the circumstances surrounding the encounter, including the conduct of the police. ***United States v. Wright*, 106 F.3d 394 (table), 1997 WL 28463, \*\*1 (4ᵗʰ Cir. 1997) (citing *United States v. Mendenhall*, 446 U.S. 544, 558 (1980); *United States v. Smith*, 30 F.3d 568, 571 (4ᵗʰ Cir. 1994); and *United States v. Bueno*, 21 F.3d 120, 126-27 (6ᵗʰ Cir. 1994)).**

## III.  DISCUSSION

The Court finds, considering the totality of the circumstances, that the Defendant consented to the entry and search of his home.  Although defense counsel alleged the deputy sheriffs had in some manner conspired with the informant to gain entry into the Defendant's home, the Defendant

did not present any evidence of any such scheme. Deputy Jardon testified that he was not aware that the informant with whom he had been working had made a report to DSS about children in the Defendant's home while methamphetamine was being manufactured. And, he testified that DSS was not aware that the sheriff's department had been working with an informant in an investigation of the Defendant.

The Court also finds that the Defendant's testimony regarding what he knew about his right to refuse DSS entry into his home was not credible. When directly questioned as to when he learned that he could not refuse such access, he testified that he learned this information from his attorney. That would, of necessity, mean that the Defendant did not know at the time the officers and social workers were at his home that he could not refuse consent. In fact, his testimony indicates that this was nothing more than a legal theory devised to attack the consent.

Assuming *arguendo*, however, that the Defendant did think he had to allow the social workers to check inside his house for children, the Court still concludes his consent was freely given. He testified that he had known Deputy Hughes most of his life. His demeanor was described as cooperative and pleasant and he openly stated there were no children in

the house.  Nonetheless, he allowed the officers to enter and having been given his consent, it was not unreasonable for Hensley and Jardon to go upstairs to look for children.  And, the evidence of methamphetamine was in plain view because the closet had no door, contrary to the argument in Defendant's brief that it "was hidden from plain view on a shelf inside a closet."  **Motion to Suppress, filed December 9, 2005, at 6.**

The Court, therefore, concludes that the Defendant voluntarily and knowingly consented to the entry into his home and the subsequent search thereof.

## IV.  ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's motion to suppress is hereby **DENIED**.

**Signed: January 17, 2006**

Lacy H. Thornburg
United States District Judge